## CONTRACTS FOR PROTECTION OF PROPERTY DURING STRIKE.

Circuit Court of Cuyahoga County.

THE UNITED STATES COAL COMPANY v. FRANK M. OSBORNE ET AL; THREE CASES.

Decided, May 31, 1910. ·

*Corporations—Contracts Between, to Protect Property During Strike.*

A contract between several coal companies providing that they shall at joint expense, to be paid ratably by each, according to tonnage of its mines, hire guards to protect the property and employees of one of the companies and operate its mines during a strike affecting all of them, is a lawful contract, upon sufficient consideration, and not beyond the powers of such corporations to enter into.

*Henderson, Quail & Siddall,* for plaintiffs.

MARVIN, J.; WINCH, J., and HENRY, J., concur.

Each of these several cases is an appeal from the judgment of the court of common pleas made in a single case, the appeals being taken by separate defendants. The plaintiff brought suit for an accounting and payment of certain moneys which it claims to be due to it from a large number of defendants, including each of these appellants, to-wit, the Dayton Coal Co., the Milton Coal Co. and the Superior Coal Co. The claim of the plaintiff is based upon its alleged rights growing out of the performance by it of the provisions of certain contracts, which it says were entered into between it and each of the defendants on the 8th and 11th of May, 1906. And the plaintiff uses this language in declaring what the contract was:

"Desiring to have said Plum Run mine operated on their joint account and for their joint benefit, entered into a contract with this plaintiff, by the terms of which they agreed that the plaintiff should proceed to operate the said Plum Run mine and deliver or consign the coal removed therefrom to such persons and at such places as a committee of said defendants known as an executive committee should direct, and that the said defendants last above named, would pay to the plaintiff all the expenses of every character and description connected with such opera-

tion upon presentation to such executive committee of properly receipted bills or vouchers showing the amount thereof, the same to be paid as so presented, and the plaintiff to be permitted to receive and retain five cents per ton for all the coal so mined and shipped.   Thereupon the plaintiff at once entered upon the performance of said contract and in pursuance thereof, expended large amounts of money, and incurred large obligations on behalf of said defendants in preparing for and carrying on said mining operations for and in delivering and consigning said coal as provided in said agreement.   By agreement of all of the said parties to the said contract such operation continued until the 20th day of June, 1906, on which date the defendants, Frank M. Osborne, J. J. Roby, George M. Jones, J. C. McKinley, Thomas E. Young, J. P. Burton, Charles E. Maurer, Franklin Neff, John Simpson, Lute Hornickel, Hudson E. Willard, Pitt Townsend, William B. Murray, F. P. Jones, Clifford Ayres, John F. Johnson, William J. Sampson and Alfred S. McGary, many of whom were parties to the said Plum Run mine thereafter operated on their joint account and for their joint benefit by this plaintiff, entered into a contract with the plaintiff whereby it was agreed that the said operation of said mine should be continued in the same manner as that in which it had been conducted under the said contract of May 11, 1906, and that the said defendants last above named would assume and pay all the expense thereof from and after the time of the termination of the operations under the said contract of May 11, 1906.   This plaintiff proceeded to operate the said mines, and incurred in doing so many large expenses and also at the request of the said parties incurred further expense in an effort to operate another mine known as plaintiff's Crow Hollow mine, which effort, however, was shortly abandoned.''

These contracts, if any were made, were made at a meeting of representatives of the plaintiff and the several defendants, all of whom were operators of coal mines in what is known as the ''Ohio district,'' and at a meeting of what is known as the Eighth district, at Cleveland, on May 11th.

At the time of entering into these contracts there was a general strike among the miners in the district so extensive that it prevented the safe operation of any of the mines owned by the several parties, and the purpose of the contracts was that some one of the mines should be opened and the miners who should be employed in such mine, together with the property connected

with the mine, should be protected. To do this it was resolved that:

  "A general committee of fourteen be appointed by this body, which committee shall have full power to act under these resolutions in the selection of mines to be operated, to take charge of the operation of the same; to appoint sub-committees in the several districts in which such mines may be located, and also have power to levy assessments upon our tonnage to pay any expenses incurred therein. And we hereby pledge ourselves to pay such assessments as may be levied under these resolutions."

That committee of fourteen was selected. Several meetings of the representatives of the parties to this suit were held. Without stopping to enumerate the action taken at each of these several meetings, suffice it to say that the arrangement made was that this committee of fourteen should select, as the resolution provided, a mine or mines to be operated. It selected what was known as Plum Run mine of the plaintiff, as the one to be opened. That was opened and operated, in pursuance of the resolution. A large expense was incurred in opening and operating this mine, including as was contemplated by the parties, the employment of guards to protect the miners and the property. Assessments were made upon the several parties represented at these meetings, including these several defendants, for their proportionate share, by tonnage, of the expenses thus incurred. These expenses were paid by the plaintiff and it now seeks to recover, after an accounting, the part of such expense which it claims the several defendants should pay. There is no dispute here as to the amount expended by the plaintiff, nor as to the proportionate share of the several defendants, provided it shall be found that they are under obligation to pay any part of this expense. On the part of the defendants, however, it is urged that no legal contract was entered into by which they are bound to respond in any sum whatever. It is urged, first, that the alleged contract is against public policy, and it is said in argument, as sustaining this view, that the bringing of guards to protect this mine, which would have to be operated by strike breakers, if operated at all, was a menace to the strikers, and was

calculated to bring about strife and bloodshed, not contemplated by the contract; that there were employed as guards for the purpose of protecting the miners and property, men from the Pinkerton Detective Agency, and that the feeling against men of that agency was such among the strikers that it was known that the employment of these men was likely to bring about the results already mentioned.

Certainly the employment of men to guard the property and the employees who should be engaged in working such property was a matter in which neither the strikers nor any other citizen outside of the parties to this contract had any interest. It was not a menace to any law-abiding citizen to have the property thus guarded. One may surely employ whom he will to guard his property and protect his employees against any danger which he apprehends, whether such apprehension be well founded or not, and whoever undertakes to interfere with or to prevent those thus guarding property and persons is himself to blame if any bloodshed or other trouble comes from such guard of property and persons. It is not for outsiders to say what number of men or how strong a guard shall be put over one's property and employees. If one apprehends that his property, his family, or his employees are in danger of interference by outsiders having no interest in the matter, he may employ what force he will, and as long as such force confines itself to the guarding of the persons and property which they are employed to guard, it is not the business of any outsider to interfere or complain. There was nothing in this regard in this contract against public policy.

It is further said that this was an attempt to form a partnership between the several parties to the contract; that most, if not all of them, were corporations, and that corporations may not enter into partnership. We fail to find that this contract was in the nature of a partnership. A partnership is generally defined to be a contract between two or more persons, whereby they unite their money, effects, labor or skill, or any or all of them, with an agreement to share the losses and divide the profits in certain proportions among them. Though this definition may not be strictly accurate, there must always be in a contract of part-

nership some arrangement as to the division of profits. Here there was no agreement of that sort. It was understood from the beginning that instead of there being profits, the mine would be operated at a loss, and therefore no agreement was entered into with reference to profits. It was important to the several parties to this contract that work be done in several mines. They found themselves so situated that no one man could operate his mine without the assistance of those similarly situated. They knew that for any one of them to operate a mine, it must be attended with great expense, but that if one mine could be operated as against the strikers, it would tend to make it possible for all the mines to be operated, and so they might very well agree to share in the expense of operating some one mine. This contract was no more a contract of partnership than would be a contract between two men, A and B, each of whom wanted something done, that A should contribute to the expense of having something done by B, for which he should be compensated by B's agreement to do something thereafter for A.

If it be said that the promise made by these several defendants was without consideration, it is a sufficient answer to say that because of such promise the plaintiff was induced to make an outlay of money, which it would not otherwise have made, whether such outlay resulted in benefit to the promisor or not.

It has already been said in this opinion that the amount owing by each, if anything is owing, is not in dispute here. Perhaps this should be somewhat qualified, for some claim was made in argument and is made in the brief of counsel for defendant, that in no event could any one of the parties to the contract, be required to pay more than his proportionate share, estimated by tonnage, of the entire expense incurred. That is, the aggregate tonnage of the several parties to the contract being fixed, if the tonnage of any one of the defendants was, say, a twentieth part of such aggregate tonnage, then such party could be required to pay but a twentieth part of the entire expense, and not that all should pay the entire expense, so that if one failed to pay, the amount to be paid by each of the others would thereby be increased. We do not so understand the contract. The language

is as expressed in the resolution passed at the meeting at Columbus, and is: ''We hereby pledge ourselves to pay such assessments as may be levied under these resolutions.''

This is a joint promise and binds all the promisors to the payment of the entire assessment. This is equally true as to the resolution passed at Cleveland on May 11th, which reads:

''This association guarantees to Mr. Willard and his company the total payment to him or it of all expenses of every nature and description connected with said operation.''

The Mr. Willard mentioned in the resolution was the secretary and manager of the United States Coal Company, and this company was meant by the words ''His Company'' used in the resolution. The claim made by the defendant that the contract was *ultra vires* on the part of any of the defendants is not well taken. The contract was made with a view to the promotion of the interests of the business of each of the parties thereto, and was a legitimate exercise of the rights of each to carry on its business, because, as has already been said, the purpose was to get one mine open to the end that others might thereby be enabled to be opened. The authority of the parties attending the meeting to which attention has been called, and representing the several defendants, is sufficiently established by the fact that all parties recognized the contract as binding in the beginning. In any event, the plaintiff was induced to incur the expenses which were incurred by reason of this action of the representatives of the several defendants, and this with the full knowledge of the defendants, and practically acquiesced in by all of them.

Without entering into a discussion of other points urged on the part of the defendants, we reach the conclusion that the plaintiff is entitled to recover against the several defendants the proportionate share of each, estimated on the tonnage, to make up the amount of the expenditures incurred by the plaintiff, and judgment will be entered accordingly.